ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID T. WISSBROECKER (243867)
EDWARD M. GERGOSIAN (105679)
PHONG L. TRAN (204961)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dwissbroecker@rgrdlaw.com
egergosian@rgrdlaw.com
ptran@rgrdlaw.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| ROBERT WYTAS and DEAN CROMBIE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> SCOTT A. McGREGOR, HENRY SAMUELI, ERIC K. BRANDT, ROBERT E. SWITZ, JOHN E. MAJOR, ROBERT J. FINOCCHIO, NANCY H. HANDEL, EDDY W. HARTENSTEIN, MARIA M. KLAWE, WILLIAM T. MORROW, HENRY T. NICHOLAS III, AVAGO TECHNOLOGIES LIMITED, PAVONIA LIMITED, SAFARI CAYMAN L.P., AVAGO TECHNOLOGIES CAYMAN HOLDINGS LTD., AVAGO TECHNOLOGIES CAYMAN FINANCE LIMITED, BUFFALO CS MERGER SUB, INC. and BUFFALO UT MERGER SUB, INC., <br><br> Defendants. | No. SACV-15-00979-JVS(PJWx) <br><br> CLASS ACTION <br><br> AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY |

1070310_1

Plaintiffs Robert Wytas and Dean Crombie ("plaintiffs"), by and through their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1. Plaintiffs bring this class action individually and on behalf of the other public stockholders of Broadcom Corporation ("Broadcom" or the "Company"), other than defendants and their affiliates, against Broadcom's Board of Directors (the "Board") and certain current and former officers and/or directors of Broadcom (collectively with the members of the Board, the "Individual Defendants"); Avago Technologies Limited, a limited company incorporated under the laws of the Republic of Singapore ("Avago"); Pavonia Limited, a limited company incorporated under the laws of the Republic of Singapore ("Holdco"); Safari Cayman L.P., an exempted limited partnership organized under the laws of the Cayman Islands and a direct wholly-owned subsidiary of Holdco ("New LP"); Avago Technologies Cayman Holdings Ltd., an exempted company organized under the laws of the Cayman Islands and a direct wholly-owned subsidiary of New LP ("Intermediate Holdco"); Avago Technologies Cayman Finance Limited, an exempted company organized under the laws of the Cayman Islands and a direct wholly-owned subsidiary of Intermediate Holdco ("Finance Holdco"); Buffalo CS Merger Sub, Inc., a California corporation and wholly-owned subsidiary of Finance Holdco ("Cash/Stock Merger Sub"); and Buffalo UT Merger Sub, Inc., a California corporation and wholly-owned subsidiary of Finance Holdco ("Unit Merger Sub," and together with Cash/Stock Merger Sub, the "Merger Subs") (the Merger Subs, Avago, Holdco, New LP, Intermediate Holdco and Finance Holdco are collectively referred to herein as the "Avago Defendants"), for breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty in connection with the proposed sale of Broadcom to Avago, and for violations of the federal securities laws arising out of defendants' dissemination of a false and

1070310_1

1    misleading registration statement in violation of §§14(a) and 20(a) of the Securities

2    Exchange Act of 1934 (the "1934 Act") and SEC Rule 14a-9 promulgated thereunder.

3        2.    Based in Irvine, California, Broadcom provides semiconductor solutions

4    for wired and wireless communications.  Defendants Henry Samueli ("Samueli"), the

5    Company's current Chief Technical Officer ("CTO") and Chairman of the Board, and

6    Henry T. Nicholas III ("Nicholas"), the Company's former President and Chief

7    Executive Officer ("CEO"), founded the Company in 1991.  Although Nicholas is no

8    longer an officer of the Company, he and Samueli together control nearly 50% of the

9    voting power of Broadcom's stockholders, giving them effective control over the

10   voting power of the stockholders.

11       3.    Avago develops, designs and supplies analog, digital, mixed signal and

12   optoelectronics components and subsystems.  Avago is incorporated in Singapore and

13   has corporate offices in Singapore and San Jose, California.

14       4.    On May 28, 2015, Broadcom and Avago jointly announced that they had

15   entered into a definitive merger agreement (the "Merger Agreement"), by which

16   Avago will acquire Broadcom in a cash and stock transaction that values the

17   *combined* company at $77 billion in enterprise value (the "Proposed Acquisition"),

18   upon consummation of the merger.

19       5.    If the Proposed Acquisition is allowed to be consummated, Broadcom's

20   stockholders will receive approximately $17 billion in cash and the economic

21   equivalent of approximately 140 million Avago ordinary shares (valued at $20 billion

22   as of May 27, 2015), for an implied value of approximately $54.50 per share (the

23   "Proposed Consideration").  The Proposed Consideration represents a meager 16%

24   premium to the Company's closing price before rumors of the Proposed Acquisition

25   were announced.

26       6.    Under the Merger Agreement, Broadcom stockholders may elect to

27   receive the Proposed Consideration as either: (i) $54.50 in cash; (ii) 0.4378 ordinary

28   shares in the newly-formed Singapore holding company, Holdco ("Holdco Ordinary

1070310_1

Shares"); (iii) a restricted equity security that is the economic equivalent of 0.4378 ordinary shares of Holdco that will not be transferable or saleable for a period of one to two years after closing ("Restricted Exchangeable Units"); or (iv) a combination thereof. The shareholder election will be subject to a proration mechanism, which is anticipated to result in payment in the aggregate in the range of 50% cash and 50% equity in the transaction. If the deal closes, Broadcom stockholders will own approximately 32% of the newly-formed company.

7. The Proposed Acquisition was the result of a hopelessly flawed and conflicted sales process. Rather than seeking to obtain the best price possible for Broadcom's stockholders, the Individual Defendants negotiated and entered into the Merger Agreement for the primary purpose of obtaining ***tax-free*** merger consideration for the benefit of Broadcom's founders, defendants Samueli and Nicholas.

8. In April 2015, Avago sought to acquire Broadcom, pursuant to a transaction in which all holders of Broadcom Class A and Class B common stock would receive consideration in the form of cash, ordinary shares of Avago, or a combination thereof. However, defendants Samueli and Nicholas, who together own approximately 149,043 shares of Broadcom Class A common stock and 47,916,270 shares of Broadcom Class B common stock, refused to proceed with any merger deal involving the payment of cash, or share-for-share exchange. Although they stood to pocket billions of dollars from such a deal, Samueli and Nicholas sought to avoid the potential tax liability that would likely result from the exchange of their Broadcom shares for cash or Avago ordinary stock.

9. Under Internal Revenue Service ("IRS") rules, stock mergers between two U.S. companies are typically tax-free to shareholders. However, because Avago is a Singapore-based company, IRS rules governing domestic mergers may not apply, and any potential merger between Avago and Broadcom involving the exchange of shares (or payment of cash) could be taxable to Broadcom's shareholders.

1070310_1

10.     As the holders of 99% of Broadcom Class B common stock and more than 8% of Broadcom's total outstanding stock (Class A and Class B common shares combined), defendants Samueli and Nicholas were desperate to avoid any near-term tax liability from a prospective acquisition with Avago and wanted to defer the tax hit to a future date that would be advantageous to them.  Accordingly, Samueli and Nicholas demanded that Broadcom's Board and management obtain an alternative form of merger consideration that would specifically benefit them – the right to exchange their Broadcom shares for restricted equity securities in the newly-formed company, *i.e.*, Restricted Exchangeable Units.  These Restricted Exchangeable Units would be subject to a strict holding period during which they could not be traded on the open market, and then after the holding period ended, the Units could be converted to ordinary shares in the new company.  Because of their non-liquid nature, Restricted Exchangeable Units would not be immediately taxable and any tax liability could be deferred until after they were converted to ordinary shares.  By electing to receive Restricted Exchangeable Units, rather than cash or ordinary shares, defendants Samueli and Nicholas could potentially save hundreds of millions of dollars in taxes in the near term.

11.     Defendants Samueli, Broadcom's current CTO and Chairman, and Nicholas, Broadcom's former President and CEO, had had no qualms about pressing the Board to secure a deal that would be most advantageous to them from a tax perspective, rather than a deal that would maximize value to all stockholders.  Their naked self-interest was highlighted when at one point during the process, defendant Nicholas demanded that Avago pay him, in his capacity as a Class B stockholder, *more* per-share consideration than would be paid to the Class A stockholders, who comprised the vast majority of Broadcom's public stockholders.  Defendant Samueli also demanded that any Class B shares converted to Restricted Exchangeable Units would not be subject to any proration, in contrast to Class A shares which would be subject to proration when exchanged for cash or ordinary shares of the combined

- 4 -

company.  The Board acquiesced to Samueli's demand and structured the Proposed Acquisition so that Restricted Exchangeable Units would not subject to any proration.

12.     Although the Board and Avago ultimately agreed to provide all Broadcom stockholders (whether Class A or Class B) the option of exchanging their shares for Restricted Exchangeable Units, the Board recognized that a substantial portion, if not a majority, of Broadcom stockholders would simply opt to receive cash or ordinary shares in the combined company, rather than elect the Restricted Exchangeable Units.  As documented in the Form S-4 Registration Statement ("S-4") filed with the United States Securities and Exchange Commission ("SEC") on July 18, 2015, many of the Company's public stockholders have investment policies or liquidity concerns that prevent them from electing to receive Restricted Exchangeable Units with strict holding periods.  Clearly, the Board secured the option to receive Restricted Exchangeable Units strictly for the benefit of defendants Samueli and Nicholas.

13.     Once the Board got what Samueli and Nicholas wanted – merger consideration in the form of tax-advantaged Restricted Exchangeable Units – they both pledged their support for the deal with Avago and signed Support Agreements, requiring them to vote their more than 48 million Broadcom shares in favor of the Proposed Acquisition. Because Samueli and Nicholas collectively control nearly 50% of the voting power of Broadcom's stockholders, the upcoming stockholder vote on the Proposed Acquisition is a mere formality.

14.     Additionally, the Support Agreements prevent any superior proposals from arising, as defendants Samueli and Nicholas are obligated to vote their shares in favor of the Proposed Acquisition, regardless of whether it is in the best interests of the Company's shareholders.

15.     Defendant Samueli stands to receive other personal benefits from the Proposed Acquisition.  Under the Merger Agreement, Avago has agreed to bring on

- 5 -

1    Samueli and one other unnamed member of the Broadcom Board to join the board of
2    the newly-formed company.

3        16.    Other members of Broadcom's Board and senior management will also
4    be handsomely rewarded for their part in orchestrating the Proposed Acquisition.
5    Indeed, members of the Board and management will receive over a hundred million
6    dollars in special payments – which are not being made to ordinary shareholders – for
7    the their previously locked-up shares, through the immediate and full vesting of their
8    stock options and restricted stock units, upon the close of the deal.   Additionally,
9    certain directors and Company insiders are set to receive more than $18 million in
10   cash as special "change-of-control" payments.   Defendant Scott A. McGregor,
11   Broadcom's President, CEO and director, alone, stands to receive more than
12   $98 million in special payments, once the deal is completed.

13       17.    Because Samueli and Nicholas control the Company and stand on both
14   sides of the Proposed Acquisition, they, along with the rest of the Individual
15   Defendants, have the burden of proving the entire fairness of the Proposed
16   Acquisition.   They will be unable to meet this burden.   While those who control the
17   Company will receive substantial and unique benefits upon the closing of the
18   Proposed Acquisition, Broadcom's ordinary stockholders will be short-changed.   As
19   the table below shows, the Proposed Consideration's premium is less than half the
20   average and median premium offered for deals over the past three years in the
21   semiconductor industry worth between $3 billion and $50 billion.

22
23
24
25
26
27
28

| Premium To Stock Price | | | |
|---|---|---|---|
| | 1-Day | 1-Week | 1-Month |
| Average: | 30.55% | 31.15% | 32.83% |
| Median: | 40.96% | 39.51% | 38.61% |
| Proposed Acquisition | 15.8% | 15.5% | 18.2% |

1070310_1

18.    The Proposed Consideration is also inadequate because it does not reflect Broadcom's strong financial track record and robust growth prospects.  On April 21, 2015, the Company announced "double-digit percentage growth" in both net revenue and operating margin for the first quarter of 2015. Based on this positive earnings report, management expected Broadcom to continue its strong financial performance and "deliver top-line growth along with operating margin leverage."

19.    After the April 21, 2015 earnings announcement, numerous analysts pegged the Company's target stock price above the Proposed Consideration.  At least four analysts set a target price for Broadcom stock as high as $59.00-$60.00 per share. Moreover, Merrill Lynch conducted a sum of the parts analysis and stated that the Company was worth between $61.00 and $75.00 per share, stating that it believed that the risks to the Company were overstated and that Broadcom's new Tomahawk switch could lead the 25 Gig Ethernet cycle in data center.

20.    In order to expedite the deal and lock up the Proposed Acquisition on these unfair and inadequate terms, defendants adopted numerous preclusive and onerous deal protection devices, which are set forth in the Merger Agreement.  These provisions, which collectively preclude any competing offers for the Company, include: (i) a Termination Fee of $1 billion if the Company accepts a competing bid; (ii) a No-Solicitation clause that discourages other, potentially superior bids; and (iii) a four-day Matching Rights period during which the Avago Defendants can match any superior proposal received by the Company.

21.    Defendants' fiduciary violations do not end there.  In order to secure shareholder approval of the flawed and unfair deal, defendants filed a materially false and misleading S-4 with the SEC on July 18, 2015.  The S-4, which recommends that Broadcom stockholders vote in favor of the Proposed Acquisition, omitted and/or misrepresented material information in contravention of §§14(a) and 20(a) of the 1934 Act.  Specifically, the S-4 contains materially misleading statements or otherwise fails to provide material information about the Proposed Acquisition, including, among

- 7 -

other things: (i) the flawed and unfair sales process undertaken by the Board; (ii) the conflicts of interest that burdened the process; (iii) the data and key inputs underlying the financial analyses performed by J.P. Morgan, Broadcom's financial advisor, and Evercore, the advisor to the Special Committee; and (iv) certain financial projections prepared by Broadcom's management and relied upon by J.P. Morgan and Evercore in rendering their opinions as to the fairness of the Proposed Acquisition.   By misrepresenting, or otherwise failing to disclose this material information, defendants obfuscated the unfair Proposed Consideration offered pursuant to the Proposed Acquisition and the actual intrinsic value of the Company.

22.   As explained herein, the foregoing information is material to the impending decision of Broadcom shareholders as to whether or not to vote in favor of the Proposed Acquisition.  Although the shareholder vote to approve the Proposed Acquisition has not yet been scheduled, defendants are moving quickly to consummate the deal.  As such, defendants' violations of §§14(a) and 20(a) of the 1934 Act and their breaches of fiduciary duty under state law to maximize shareholder value and disclose all material information in connection with a merger transaction threaten shareholders with irreparable harm for which money damages are not an adequate alternate remedy.  Thus, to remedy defendants' breaches of fiduciary duties and violations of the federal securities laws, plaintiffs seek injunctive relief preventing consummation of the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain a transaction that provides the best possible terms for stockholders, or rescission of the Merger Agreement to the extent that the Proposed Acquisition has been consummated.

23.   In addition, because the Individual Defendants control Broadcom, and will be employees and/or members of the Board of the post-acquisition company, plaintiffs have the ability to attack the validity of the merger pursuant to California Corporations Code §1312(b), in accordance with the procedures set forth in California Corporations Code §1312(c).

1070310_1

**JURISDICTION AND VENUE**

24.     Pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, this Court has jurisdiction over the claims arising under and pursuant to §14(a) and §20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.

25.     This Court also has jurisdiction pursuant to 28 U.S.C. §1332(a)(3) because plaintiffs and defendants are citizens of different states and/or a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs, and because each of the defendants has had extensive contacts with California as either a director and/or officer of Broadcom or otherwise, which makes the exercise of personal jurisdiction over them proper.  This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have

26.     Venue is proper in this District because Broadcom has a substantial presence in California and is headquartered in Irvine, California, a majority of the individuals named as defendants reside in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**THE PARTIES**

27.     Plaintiff Robert Wytas is and has been a stockholder of Broadcom at all times relevant hereto.  Plaintiff Robert Wytas is a citizen of Florida.

28.     Plaintiff Dean Crombie is and has been a stockholder of Broadcom at all times relevant hereto.  Plaintiff Dean Crombie is a citizen of New Hampshire.

29.     Non-defendant Broadcom is a California corporation with principal executive offices located at 5300 California Avenue, Irvine, California.  Broadcom is a global leader and innovator in semiconductor solutions for wired and wireless communications.   The Company has one of the strongest intellectual property portfolios among global fabless semiconductor suppliers, as ranked by the Institute of Electrical and Electronics Engineers. Upon completion of the Proposed Acquisition, Broadcom will become an indirect wholly-owned subsidiary of defendants Holdco and New LP.

1070310_1

30.     Defendant Scott A. McGregor ("McGregor") is Broadcom's President, CEO, and a director, and has been since January 2005.  Defendant McGregor is a citizen of California.

31.     Defendant Samueli is and has been Broadcom's CTO since December 2009 and is and has been Broadcom's Chairman of the Board since at least May 2012, and is a co-founder of the Company.  Defendant Samueli was also Broadcom's Chairman of the Board from May 2003 to May 2008; CTO from August 1991 to May 2008; and Vice President of Research and Development from August 1991 to March 2003.  In connection with the Proposed Acquisition, defendant Samueli entered into a support agreement with defendant Avago, pursuant to which he agreed to vote his shares in favor of the Proposed Acquisition and against any competing proposals. Defendant Samueli is a citizen of California.

32.     Defendant Eric K. Brandt ("Brandt") is and has been Broadcom's Chief Financial Officer ("CFO") since March 2007 and is and has been Executive Vice President since February 2010.  Defendant Brandt is a citizen of California.

33.     Defendant Robert E. Switz ("Switz") is Broadcom's Lead Independent Director and has been since May 2014, and a director and has been since May 2003. Switz is a citizen of Arizona.

34.     Defendant John E. Major ("Major") is a Broadcom director and has been since January 2003.  Defendant Major was also Chairman of the Board from May 2008 to May 2012 and Lead Independent Director from May 2008 to May 2014. Defendant Major is a citizen of California.

35.     Defendant Robert J. Finocchio ("Finocchio") is a Broadcom director and has been since December 2011.  Defendant Finocchio is a citizen of California.

36.     Defendant Nancy H. Handel ("Handel") is a Broadcom director and has been since November 2005.  Defendant Handel is a citizen of California.

37.     Defendant Eddy W. Hartenstein ("Hartenstein") is a Broadcom director and has been since June 2008.  Defendant Hartenstein is a citizen of California.

- 10 -

38.     Defendant Maria M. Klawe ("Klawe") is a Broadcom director and has been since May 2011.  Defendant Klawe is a citizen of California.

39.     Defendant William T. Morrow ("Morrow") is a Broadcom director and has been since June 2008.  Defendant Morrow is a citizen of California.

40.     Defendant Nicholas is a co-founder of Broadcom and was Broadcom's President, CEO, and Co-Chairman of the Board from 1991 to January 2003.  In connection with the Proposed Acquisition, Nicholas entered into a support agreement with defendant Avago, pursuant to which he agreed to vote his shares in favor of the Proposed Acquisition and against any competing proposals.  Nicholas and Samueli together control around 47% of the voting power of the Company, a de facto controlling block.  Defendant Nicholas is a citizen of California.

41.     Defendant Avago is incorporated under the laws of the Republic of Singapore.  Upon completion of the acquisition, defendant Avago will become an indirect wholly-owned subsidiary of defendants Holdco and New LP.  Defendant Avago is a citizen of Singapore.

42.     Defendant Holdco is incorporated under the laws of the Republic of Singapore.  Upon completion of the Proposed Acquisition, defendant Holdco will be renamed Broadcom Limited and will be the sole general partner of New LP.  Defendant Holdco is a citizen of Singapore.

43.     Defendant New LP is incorporated under the laws of the Cayman Islands and is a direct wholly-owned subsidiary of defendant Holdco.  Defendant New LP will be the sole general partner of Broadcom Limited.  Defendant New LP is a citizen of the Cayman Islands.

44.     Defendant Intermediate Holdco is an exempted company organized under the laws of the Cayman Islands and is a direct wholly-owned subsidiary of New LP.  Defendant Intermediate Holdco is a citizen of the Cayman Islands.

45.     Defendant Finance Holdco is an exempted company organized under the laws of the Cayman Islands and is a direct wholly-owned subsidiary of defendant

- 11 -

1070310_1

1  Intermediate Holdco.   Pursuant to the Merger Agreement, all ordinary shares of

2  Avago will be transferred to Finance Holdco.  Defendant Finance Holdco is a citizen

3  of the Cayman Islands.

4       46.    Defendant Cash/Stock Merger Sub is a California corporation and

5  wholly-owned subsidiary of Finance Holdco.  Upon completion of the Proposed

6  Acquisition, defendant Cash/Stock Merger Sub will merge with and into Broadcom

7  and cease its separate corporate existence.  Defendant Cash/Stock Merger Sub is a

8  citizen of California.

9       47.    Defendant Unit Merger Sub is a California corporation and wholly-

10  owned subsidiary of Finance Holdco.  Upon completion of the Proposed Acquisition,

11  defendant Unit Merger Sub will merge with and into Broadcom and cease its separate

12  corporate existence.  Defendant Unit Merger Sub is a citizen of California.

13                    **DEFENDANTS' FIDUCIARY DUTIES**

14       48.    In any situation where the directors of a publicly traded corporation

15  undertake a transaction that will result in either (i) a change in corporate control or

16  (ii) a break-up of the corporation's assets, the directors have an affirmative fiduciary

17  obligation to obtain the highest value reasonably available for the corporation's

18  shareholders, and if such transaction will result in a change of corporate control, the

19  shareholders are entitled to receive a significant premium.  To diligently comply with

20  these duties, the directors may not take any action that:

21              (a)    adversely affects the value provided to the corporation's

22  shareholders;

23              (b)    discourages or inhibits alternative offers to purchase control of the

24  corporation or its assets;

25              (c)    contractually prohibits them from complying with their fiduciary

26  duties;

27

28

1     (d) otherwise adversely affects their duty to search and secure the best

2  value reasonably available under the circumstances for the corporation's shareholders;

3  and/or

4     (e) provides the directors with preferential treatment at the expense of,

5  or separate from, the public shareholders.

6    49. In accordance with their duties of loyalty and good faith, the Individual

7  Defendants, as directors and/or officers of Broadcom, are obligated to refrain from:

8     (a) participating in any transaction where the directors' or officers'

9  loyalties are divided;

10     (b) participating in any transaction where the directors or officers will

11  receive a personal financial benefit not equally shared by the public shareholders of

12  the corporation; and/or

13     (c) unjustly enriching themselves at the expense or to the detriment of

14  the public shareholders.

15    50. The Individual Defendants are also required to disclose fully and fairly

16  all material information within their custody and control regarding the corporate

17  transaction at issue, the consideration offered for the shareholders' equity interests,

18  and the intrinsic value of the Company and its future prospects.

19    51. Plaintiffs allege herein that defendants, separately and together, in

20  connection with the Proposed Acquisition, are breaching and/or aiding and abetting in

21  the breaches of fiduciary duties owed to plaintiffs and the other public shareholders of

22  Broadcom, including the duties of loyalty, good faith, candor, due care and

23  independence.  As a result of these breaches of fiduciary duties and the aiding and

24  abetting therein, neither plaintiffs nor the Class will receive adequate or fair value for

25  their Broadcom common stock in the Proposed Acquisition.

26    52. Because the Individual Defendants as a whole, and defendants Samueli

27  and Nicholas in particular, control the voting power of the Company, and stand on

28  both sides of the Proposed Acquisition, they will have the burden of proving the entire

1070310_1

fairness of the transaction, including all aspects of its negotiation, structure, price and terms.

53.    Specifically, in any situation where large shareholders compete with minority shareholders for consideration, the entire fairness standard is implicated, and the defendants, at least initially, bear the burden of demonstrating the two basic aspects of fair dealing and fair price.

54.    The concept of fair dealing embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.  The concept of fair price relates to the economic and financial considerations of the Proposed Acquisition, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.  The test for fairness is not a bifurcated one as between fair dealing and price.  All aspects of the issue must be examined as a whole since the question is one of entire fairness.

55.    To demonstrate entire fairness, the Individual Defendants must present evidence of the cumulative manner by which they discharged all of their fiduciary duties.  An entire fairness analysis then requires the Court to consider carefully how the Board discharged all of its fiduciary duties with regard to each aspect of the non-bifurcated components of entire fairness: fair dealing and fair price.

## CONTROL ALLEGATIONS

56.    Defendants Samueli and Nicholas founded Broadcom in 1991.  Samueli currently serves as Broadcom's CTO and has served in that position since December 2009.  Samueli is and has been Broadcom's Chairman of the Board, since at least May 2013.  Nicholas does not currently serve on Broadcom's Board or management, but he was the Company's President, CEO, and Co-Chairman of the Board from 1991 to January 2003.

1070310_1

57.     Defendants Samueli and Nicholas are Broadcom's largest shareholders. As of June 30, 2015, defendant Samueli owned 101,070 Broadcom Class A common shares and 21,745,402 Broadcom Class B common shares, while defendant Nicholas owned 49,973 Broadcom Class A common shares and 26,170,868 Broadcom Class B common shares.  Together, Samueli and Nicholas own approximately 8.2% of the Company's outstanding common stock (including 99% of the outstanding Class B common shares) and maintain control of approximately 47% of the total voting power of all Broadcom Common Shares.

58.     Because of their dominant ownership of the Company's shares, defendants Samueli and Nicholas exercise control over the outcome of the elections for the Company's Board and the Board's decision-making. Thus, each director, including each of the Individual Defendants, serves at the whim of Samueli and Nicholas.  Indeed, the Individual Defendants described Samueli's and Nicholas' effective control over corporate matters in the Company's most recent 10-K, filed on January 29, 2015, which stated: "Our co-founders and their affiliates may strongly influence the outcome of matters that require the approval of shareholders."  The 10-K also reported the following:

> As of December 31, 2014 our co-founders, directors, executive officers and their respective affiliates beneficially owned 8.8% of our outstanding common stock and held 47.3% of the total voting power held by our shareholders. As a result, the voting power of these shareholders may strongly influence the outcome of matters that require the approval of our shareholders, including the election of our Board of Directors and certain significant corporate transactions. In particular, as of December 31, 2014 our two founders, Dr. Henry T. Nicholas III and Dr. Henry Samueli, beneficially owned a total of 8.2% of our outstanding common stock and held 47.0% of the total voting power held by our shareholders. Because of their significant voting stock ownership, we may not be able to engage in certain transactions, and our shareholders may not be able to effect certain actions or transactions, without the approval of one or both of these shareholders.

59.     Defendant Samueli not only controlled the Board through his ability to control the elections of directors and matters involving shareholder voting, he was

- 15 -

1  also involved in the day-to-day operations and management of Broadcom by virtue of

2  his position as the Company's CTO and Chairman.

3          60.      Defendant Samueli's involvement in the day-to-day operations and

4  management of the Company is further demonstrated by the fact that in 2014 and

5  2015, he personally met with representatives of Avago and other potential acquirors to

6  discuss strategic combinations involving Broadcom.  Samueli's leadership role in the

7  Company is also highlighted by the fact that his name and titles appear prominently in

8  the introduction section of the July 29, 2015 Joint Proxy Statement/Prospectus, which

9  informs the Company's shareholders of the upcoming shareholder vote to approve the

10  Proposed Acquisition.

11          61.      Accordingly, both defendants Samueli and Nicholas had or has common

12  control over two or more parties to the Proposed Acquisition, thus providing plaintiffs

13  with the ability to attack the validity of the merger pursuant to California Corporations

14  Code §1312(b), in accordance with the procedures set forth in California Corporations

15  Code §1312(c).

16                          **SUBSTANTIVE ALLEGATIONS**

17  **The Proposed Acquisition**

18          62.      Founded in 1991 by defendants Samueli and Nicholas, Broadcom is one

19  of the largest semiconductor companies in the world.  Broadcom designs and develops

20  semiconductor solutions for wired and wireless communications and contracts with

21  independent chip-making facilities to manufacture them.  Broadcom holds more than

22  10,940 U.S. and 3,925 foreign patents.  The Company employs more than 10,000

23  employees worldwide, thousands of whom are based out of its Irvine, California

24  headquarters.

25          63.      In the period leading up to the Merger Agreement, Broadcom was

26  experiencing surging growth and was well-positioned for sustained, long-term

27  profitability as a stand-alone company.  On April 21, 2015, the Company announced

28  strong financial results for the first quarter of the 2015 fiscal year.  During the

- 16 -

earnings call held the same day, defendant McGregor, Broadcom's President, CEO and a director, reported "double-digit percentage growth" in both net revenue and operating margin for the Company's Broadband and Connectivity lines of business (Broadcom's largest business segments). McGregor emphasized that management expected Broadcom to continue its strong financial performance and "deliver top-line growth along with operating margin leverage."

64.     Thus, in the months leading up to the Proposed Acquisition, Broadcom was well on its way to delivering robust and long-term returns to its shareholders. However, on April 10, 2015, just a few weeks before the announcement of the Company's first quarter financial results, Broadcom was contacted by Avago about a potential acquisition of the Company. Avago, a semiconductors company based in Singapore, had initially approached Broadcom about a potential acquisition in the fall of 2014, but those discussions were terminated by the end of 2014.

65.     This time around, Avago was determined to close on Broadcom. On April 13, 2015, Avago delivered a written proposal to defendant McGregor to acquire Broadcom at a price of $51.00 per share, with half the consideration paid in cash and the other half in stock, subject to proration. Avago's proposal contemplated that the holders of Broadcom's Class A and Class B common stock would be paid the same consideration. As a condition of its proposal, Avago required that defendants Samueli and Nicholas, as Broadcom's dominant shareholders with over 99% of the Class B shares and nearly 50% of the total voting power, execute voting agreements in support of the deal.

66.     On April 21, 2015, Broadcom's Board held a meeting during which the Company's financial advisor, J.P. Morgan, made a financial presentation concerning the terms of Avago's April 13, 2015 proposal. After the presentation, the Board directed management to only engage in further discussions with Avago if Avago increased its price ***above the mid-$50s***.

67.     On April 24, 2015, Avago submitted a revised proposal to acquire the shares of Broadcom Class A and Class B common stock at a price of $54.50 per share, with each holder of Class A and Class B stock entitled to receive consideration in the form of cash, ordinary shares of Avago, or combination of cash and Avago ordinary shares, subject to proration such that the overall mix of consideration would be 50% cash and 50% stock.

68.     Later that day, the Board directed management to pursue Avago's proposal, despite its previous directive not to engage with Avago unless the company was willing to offer a price above the mid-$50s range.  From that point onward, the Board and management declined to press for any increase in price over the $54.50 per share offered by Avago on April 24, 2015.

69.     On April 28, 2015, Company A, a potential public strategic acquiror, contacted defendant McGregor and indicated its interest in exploring a potential transaction with Broadcom.

70.     By early May 2015, the Board and Avago began negotiating with defendants Samueli and Nicholas, as the majority holders of Class B stock, to get their support for the potential acquisition.  Samueli and Nicholas collectively held close to 49 million shares of Class B stock and stood to gain more than *$2.6 billion* in total value from just their Class B shares alone once the deal closed.  However, Samueli and Nicholas were concerned about the potential tax liability they would incur under the deal and consequently refused to tender their support for the deal as proposed by Avago.

71.     Under IRS rules, stock mergers of two U.S. companies are typically tax-free to shareholders.  But because Avago is a Singapore-based company, IRS rules governing domestic mergers may not apply, and any potential merger between Avago and Broadcom involving the exchange of shares (or the payment of cash) could be taxable to Broadcom's U.S. shareholders, particularly if the IRS deems Broadcom to be larger than Avago by the time the deal closes.

- 18 -

72.     Thus, any merger transaction between Broadcom and Avago involving a share-for-share exchange, the payment of cash, or the combination of both, could potentially have substantial tax implications to defendant Samueli and Nicholas, who collectively own more than 8% of Broadcom's shares.   Samueli and Nicholas therefore sought to protect their own interests by actively negotiating a deal that would be most advantageous to them from a tax perspective, instead of pursuing a deal that would be in the best interest of Broadcom's public shareholders.

73.     On May 5, 2015, defendant Samueli indicated that he would be willing to enter into an agreement supporting the Proposed Acquisition if Avago were willing to allow holders of Class B common stock (of which Samueli and Nicholas owned 99%) to exchange their Class B shares for ordinary shares, or restricted limited partnership units in the newly-formed company.   Under Samueli's proposal, Class B holders would not receive any cash as merger consideration.   The purpose of Samueli's proposal was clear – by specifically excluding any cash merger consideration, Samueli sought to roll over his Class B shares into the newly-formed company and defer any tax liability that would arise from the payment of cash.   Samueli also demanded that any merger consideration paid to Class B holders would not be subject to any proration, unlike the consideration paid to Class A holders.

74.     Defendant Nicholas likewise indicated that he wanted to receive all equity consideration and no cash as part of any transaction with Avago.   Nicholas, the former President and CEO of Broadcom, went a step further and demanded that Avago pay him *more* per-share consideration than would be paid to the Broadcom Class A shareholders, who comprised the vast majority of the public shareholders of the Company.   Nicholas sought to be paid more consideration for his Class B shares, despite prior corporate filings by Broadcom which required holders of Class A and Class B common stock to be paid identical consideration in the event of a merger transaction.

- 19 -

75.     The Board subsequently formed a Special Committee, comprised of all directors except defendants Samueli and McGregor, ostensibly for the purpose of determining whether the holders of the Company's Class A common stock would receive the same merger consideration as the holders of Class B stock (*i.e.*, Samueli and Nicholas).  Evercore was retained as the Special Committee's "independent" financial advisor.

76.     In the weeks that followed, Broadcom's management and Special Committee devoted their efforts to negotiating a merger transaction with Avago that was in Samueli's and Nicholas' best interests, as opposed to the best interests of the public shareholders.  On May 26, 2015, Avago submitted what would be its final proposal, which was based on the tax-advantaged structure proposed by defendant Samueli on May 5, 2015.  However, Avago's proposal contemplated that holders of both Broadcom Class A common stock and Class B common stock would have the option of obtaining the same forms of merger consideration, either all cash, ordinary shares in the newly-formed company (Holdco Ordinary Shares), the combination of cash and Avago common stock, or restricted exchangeable limited partnership units (Restricted Exchangeable Units), which after a strict holding period, could be exchanged for shares of Avago common stock.  Under Avago's proposal, the cash and share-for-share consideration were subject to proration depending on the percentage of stockholders electing each form of consideration, while the Restricted Exchangeable Units were not subject to any proration.  Avago's proposal was contingent upon Samueli's and Nicholas' agreement to execute support agreements in favor of the Proposed Acquisition.

77.     Additionally, as part of its proposal, Avago agreed to designate Samueli and one other member of Broadcom's Board to the board of the new company.

78.     The next day, on May 27, 2015, the CFO of Company D contacted both defendant McGregor and Broadcom's CFO, defendant Brandt, to indicate Company D's interest in a business combination with Broadcom.  The CFO of Company D

- 20 -

1   indicated that while Company D was interested in doing a transaction with Broadcom,

2   it was not in the position to move quickly.

3        79.    Despite Company D's expression of interest and Company A's prior

4   expression of interest, Broadcom's Special Committee and Board decided to move

5   forward to authorize the Proposed Acquisition with Avago.  The Special Committee

6   convened a meeting that same day, during which Evercore opined that the merger

7   consideration that would be paid to Broadcom stockholders who choose not to elect to

8   receive Restricted Exchangeable Units was fair from a financial perspective.

9   Thereafter, the Special Committee recommended that the full Board approve the

10  Proposed Acquisition.

11       80.    The full Board also met on May 27, 2015.  Not surprisingly, J.P. Morgan,

12  the Board's financial advisor, opined that the merger consideration offered by Avago

13  was fair from a financial perspective.  The Board then unanimously approved the

14  Merger Agreement and related agreements, including the Support Agreements entered

15  into by defendants Samueli and Nicholas.

16       81.    Both J.P. Morgan and Evercore were handsomely compensated for

17  rendering their respective fairness opinions in favor of the Proposed Acquisition.

18  Broadcom's Board agreed to pay J.P. Morgan an exorbitant contingency fee of more

19  than ***$58 million***, for an engagement that lasted little over a month.  J.P. Morgan was

20  paid $3 million of the fee upon the delivery of its fairness opinion, with the remainder

21  of the fee to be paid upon the closing of the Proposed Acquisition.

22       82.    Likewise, the Board agreed to pay Evercore a fee of ***$10 million***,

23  $1 million of which was paid upon the firm's retention and $9 million of which was

24  paid upon the delivery of its opinion.

25       83.    On May 28, 2015, Broadcom and Avago announced that they had entered

26  into the Merger Agreement, pursuant to which Avago will acquire all the outstanding

27  shares of Broadcom for a total transaction consideration of $37 billion.  The press

28  release stated in relevant part:

1070310_1

**Avago Technologies to Acquire Broadcom for $37 Billion**

- Creates the world's leading diversified communications semiconductor company

- Transaction consideration of $17 billion in cash and equity valued at approximately $20 billion as of May 27, 2015

- $750 million of projected annual cost synergies expected to be achieved within 18 months

- Immediately accretive to non-GAAP EPS and free cash flow

. . . Avago Technologies Limited (NASDAQ: AVGO) and Broadcom Corporation (NASDAQ: BRCM) today announced that they have entered into a definitive agreement under which Avago will acquire Broadcom in a cash and stock transaction that values the combined company at $77 billion in enterprise value. Upon completion of the acquisition, the combined company will have the most diversified communications platform in the semiconductor industry, with combined annual revenues of approximately $15 billion.

"Today's announcement marks the combination of the unparalleled engineering prowess of Broadcom with Avago's heritage of technology from HP, AT&T, and LSI Logic, in a landmark transaction for the semiconductor industry," said Hock Tan, President and Chief Executive Officer of Avago. "The combination of Avago and Broadcom creates a global diversified leader in wired and wireless communication semiconductors. Avago has established a strong track record of successfully integrating companies onto its platform. Together with Broadcom, we intend to bring the combined company to a level of profitability consistent with Avago's long-term target model."

"This transaction benefits all of Broadcom's key stakeholders," remarked Scott McGregor, President and Chief Executive Officer of Broadcom. "Our customers will gain access to a greater breadth of technology and product capability. For our shareholders, the transaction provides both compelling up-front value as well as the opportunity to participate in the future upside of the combined business."

"When Henry Nicholas and I founded Broadcom, we had a vision of creating the world leader in communications semiconductors. Today's announcement is a continuation of that vision and we could not think of a better partner for the future than Avago," stated Dr. Henry Samueli, Co-Founder, Chief Technical Officer and Chairman of the Board of Broadcom.

"The culture that Henry and I created when we founded Broadcom was demanding, execution-oriented, and certainly not guaranteed to mesh with the average technology company," said Dr. Henry T. Nicholas, Co-Founder and past CEO of Broadcom. "It was, however, a culture that enabled Broadcom to grow exponentially and emerge as the market leader in every major market segment involving broadband communications. In Avago, we have found a culture and a management team that embody the best of the philosophies on which Broadcom was

- 22 -

founded, together with a fast-paced, no-nonsense, process-driven business culture that we need to take our combined company to the next level. I am confident that, under the visionary leadership of Hock Tan, the combined company will realize its potential to be the world's greatest semiconductor company."

Following completion of the transaction, Mr. Tan, President and Chief Executive Officer of Avago, will continue to serve as President and Chief Executive Officer of the combined company, which will adopt the name Broadcom Limited. Dr. Samueli will join the board of the combined company as will another director from Broadcom. In addition, Dr. Samueli will be appointed Chief Technology Officer of the combined company. Dr. Nicholas will serve in a strategic advisory role within the combined company, reporting to Mr. Tan.

**Transaction Structure and Terms**

Under the terms of the definitive agreement, Avago will acquire Broadcom for $17 billion in cash consideration and the economic equivalent of approximately 140 million Avago ordinary shares, valued at $20 billion as of May 27, 2015, resulting in Broadcom shareholders owning approximately 32% of the combined company. Based on Avago's closing share price as of May 27, 2015, the implied value of the total transaction consideration for Broadcom is $37 billion.

Holders of outstanding shares of Broadcom will have the ability to elect to receive, for each Broadcom share held: (i) $54.50 in cash; (ii) 0.4378 ordinary shares in a newly-formed Singapore holding company ("HoldCo"); (iii) a restricted equity security that is the economic equivalent of 0.4378 ordinary shares of HoldCo that will not be transferable or saleable for a period of one to two years after closing; or (iv) a combination thereof. The shareholder election will be subject to a proration mechanism, which is anticipated to result in payment in the aggregate in the range of 50% cash and 50% equity in the transaction. Upon closing of the transaction, Avago shareholders will exchange their ordinary shares for HoldCo ordinary shares on a one to one basis.

No trading market is expected to develop for the restricted equity. The receipt of the restricted equity is expected to be tax free to former Broadcom shareholders, and if a requested tax ruling is obtained from the IRS, the receipt of HoldCo ordinary shares will also be tax free to the Broadcom shareholders. Receipt of HoldCo ordinary shares by former Avago shareholders is expected to be tax free.

Avago intends to fund the $17 billion of cash consideration with cash on hand from the combined companies and $9 billion in new, fully-committed debt financing from a consortium of banks.

The transaction has been unanimously approved by the boards of directors of both companies, as well as a special committee of the independent directors of Broadcom. Dr. Samueli and Dr. Nicholas, the founders of Broadcom, have signed support agreements to vote to approve the transaction. Closing of the transaction is expected by the end of the first calendar quarter of 2016, and is subject to regulatory

- 23 -

approvals in various jurisdictions, as well as the approval of Avago's and Broadcom's shareholders.

**Defendants Used the Merger Agreement and Support Agreements to Lock Up the Transaction**

84.     Remarkably, the "process" which led to the Proposed Acquisition spanned little over a month – from the date of Avago's inquiry to the announcement of the deal.  During this abbreviated process, Broadcom's Board and management overwhelmingly favored Avago and failed to consider other value-maximizing alternatives, including a high-premium, all-cash transaction.  The Board failed to pursue a reasonable market check, as it made no real attempt to progress beyond cursory discussions with other interested parties, including Company A and Company D.

85.     From the outset, the Board was focused on structuring a deal with Avago that would be most advantageous from a tax perspective to Broadcom's founders, defendants Samueli and Nicholas, rather than pursuing a process that would maximize shareholder value.  As such, Avago was able to employ a "divide and conquer" strategy to exploit the Board's desire for a tax-free deal that largely benefitted the Company's founders, resulting in an inadequate price to the public shareholders that did not reflect the Company's true value.  Despite Broadcom's recent announcement of strong earnings growth and analyst price targets for Broadcom in the *$59.00-$60.00* per share range, the Company's Board and management readily acquiesced to Avago's terms and settled for the meager Proposed Consideration of $54.50 per share.

86.     To expedite the closing of the deal and protect Avago against the threat of superior, competing offers from other buyers, defendants implemented a number of unfair and restrictive deal protection devices.  First, the Board encouraged and authorized defendants Samueli and Nicholas to enter into Support Agreements, pursuant to which they have agreed to vote their more than 48 million shares in favor of the Proposed Acquisition and against any alternative acquisition proposal.  Samueli and Nicholas together control nearly 50% of the voting power of Broadcom's

stockholders, giving them effective control over the voting power.  Accordingly, the Support Agreements executed by Samueli and Nicholas effectively render the upcoming stockholder vote on the Proposed Acquisition a mere formality.  Moreover, the Support Agreements serve as a deterrent to potentially interested suitors who will face a significant disadvantage when attempting to procure the necessary stockholder support for a competing proposal.

87.     The Board agreed to other "lock-up" provisions in the Merger Agreement that were designed to ensure the sale of Broadcom to Avago, on terms preferential to Avago, and to subvert the interests of the public shareholders of Broadcom.  The Merger Agreement contains a strict "No Solicitation" provision that prevents Broadcom from seeking a better deal for its shareholders.  Under this onerous provision, Broadcom is prohibited from, directly or indirectly, initiating or soliciting any inquiry from a third party that could lead to a competing acquisition proposal.  Moreover, Broadcom cannot even participate in any discussions with, or disclose any information to, any third party in connection with any other potential acquisition proposal.

88.     Although the Merger Agreement ostensibly has a "fiduciary out" provision that permits the Company to negotiate with a third party who has submitted a written acquisition that is potentially superior to the Proposed Acquisition, the potential acquirer would first have to make an ***unsolicited*** offer on its own.  Without access to non-public information, which the Company is prevented from offering under the Merger Agreement prior to the receipt of an offer that the Company reasonably expects to lead to a superior deal, there is little possibility that another bidder will emerge to make such a qualified competing proposal.

89.     The Board has further agreed to a broad "Matching Rights" provision that gives Avago substantial procedural advantages over any subsequent competing bidder.  Under this provision, Broadcom has agreed to promptly notify Avago (within 24 hours) of: (i) any competing acquisition proposal; (ii) the material terms and

conditions of any such proposal (and any changes thereto); (iii) the identity of the party making any such proposal; and (iv) whether Broadcom's Board determines the competing acquisition proposal to be superior to the Proposed Acquisition.  And, even if an unsolicited bidder were to emerge, which is highly unlikely, the Matching Rights provision allows Avago four business days within which to amend the terms of the Merger Agreement and make a counter offer that only needs to be as favorable to the Company's shareholders as the unsolicited offer.  Avago will therefore be able to match any hypothetical unsolicited offer because the Merger Agreement also grants it unfettered access to the superior proposal, in its entirety, thereby eliminating any leverage that the Company has as a result of receiving the unsolicited offer.

90.     The Board further reduced the likelihood of obtaining a superior offer or the best possible price for the Company's public stockholders by agreeing to a substantial Termination Fee.  The Merger Agreement provides that Broadcom will be required to pay Avago a Termination Fee of *$1 billion*, upon the Board's acceptance of a superior proposal.

91.     All of these unduly restrictive deal protection devices, in combination with one another, act to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The inclusion of these provisions in the Merger Agreement does not provide the Board an effective "fiduciary out" under the circumstances. These provisions foreclose any realistic chance that any potential bidders will express interest or make alternative bids in order to provide the needed market check on the Proposed Acquisition.

**The Board and Company Insiders Pursued Their Own Financial and Professional Interests in Orchestrating the Proposed Acquisition**

92.     Broadcom's Board and senior management agreed to push through the Proposed Acquisition at a sub-optimal price and deprive the Company's public shareholders of the true value of their shares for self-interested reasons unrelated to

the merits of the transaction.  As detailed above, the Board was primarily motivated in securing a tax advantaged deal for the benefit of defendants Samueli and Nicholas by allowing them to exchange their $3 billion in Broadcom holdings for Restricted Exchangeable Units in the newly-formed company.

93.    By exchanging their shares to illiquid Restricted Exchangeable Units, rather than for cash or common shares, defendants Samueli and Nicholas would be able to secure tax-free treatment for their Broadcom shares, resulting in a tax savings of hundreds of millions of dollars in the near term.  This deal structure enables Samueli and Nicholas to defer their tax liability to a future date that would be more advantageous to them.  Tax deferment is particularly valuable to Samueli and Nicholas because it allows them to time any potential tax hit to offset future losses, or put the money they saved from not paying taxes into other lucrative investments.

94.    Although Avago ultimately agreed to provide all holders of Broadcom common stock the option of exchanging their shares for Restricted Exchangeable Units, the reality is only a small percentage of stockholders (aside from Samueli and Nicholas) are likely to opt for the illiquid Units, instead of cash or Holdco Ordinary Shares.  As stated in the S-4, the Special Committee recognized that many stockholders would be unwilling or unable to exchange their shares for Restricted Exchangeable Units because they are bound by investment policies or other restrictions that prevent them from owning such illiquid Units, which are subject to a strict holding period and cannot be traded on the open market.

95.    Moreover, as reported in *The Wall Street Journal*, mutual funds, which own about 25% of Broadcom's outstanding stock, are unlikely to elect Restricted Exchangeable Units.  *See* Liz Hoffman, *Avago's Pending Broadcom Purchase Taps Arcane Tax Structure*, Wall St. J., May 28, 2015.  Mutual funds are typically judged by their ***pretax*** performance, and therefore fund managers have no incentive to minimize or defer taxes.  For this and other reasons, *The Wall Street Journal* reported

1   that "Broadcom doesn't expect most of its investors would choose to take the

2   units . . . ." *Id*.

3        96.   Accordingly, Broadcom's Board and management knew that most of the

4   Company's investors had little incentive or desire to choose to receive Restricted

5   Exchangeable Units as their merger consideration.  Indeed, most investors would

6   rather take the cash or the Holdco Ordinary Shares.  Clearly, the tax-deferral structure

7   of the Restricted Exchangeable Units was negotiated strictly for the benefit of

8   defendants Samueli and Nicholas to entice them to support the Proposed Acquisition.

9        97.   In addition to providing substantial tax-deferral benefits to Samueli and

10   Nicholas, the Restricted Exchangeable Units that the founders are set to receive under

11   the Proposed Acquisition may be more valuable in certain circumstances than the

12   other forms of proposed merger consideration.  Evercore was retained ostensibly for

13   the purpose of advising the Special Committee on whether stockholders who choose

14   not to receive Restricted Exchangeable Units would receive consideration that was

15   fair from a financial perspective.  Although Evercore concluded that stockholders who

16   choose not to elect Restricted Exchangeable Units would receive fair consideration

17   under the Proposed Acquisition, Evercore's financial analysis suggests otherwise.

18   Indeed, Evercore's analysis indicates that those stockholders who elect to receive

19   Restricted Exchangeable Units (*i.e.*, Samueli and Nicholas) could potentially receive

20   more consideration in the future than non-electors (*i.e*, those who opt for cash or

21   ordinary shares).

22        98.   Specifically, for its analysis entitled "Allocation of Broadcom Merger

23   Consideration to Holders of Broadcom Common Shares that Do Not Elect to Receive

24   Restricted Exchangeable Units," Evercore calculated the implied future consideration

25   for stockholders who choose to elect to receive Restricted Exchangeable Units ("Unit-

26   electors"), as compared to those who choose not to elect Units ("Non-electors"), based

27   on a range of election scenarios whereby 0% to 100% of the Company's stockholders

28   elect to receive the Units.  Evercore's analysis indicates that under each election

- 28 -

scenario, Unit-electors will receive significantly more implied future consideration than Non-electors, as set forth in the following tables provided in the S-4.

| | Blended 2016 Non-GAAP EPS Multiple of 13.5x / $750mm of Synergies % of Broadcom Shares Electing Restricted Exchangeable Units | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0% | 8% | 15% | 25% | 50% | 75% | 100% |
| Estimated Pro Forma 2016E Non-GAAP EPS | $ 12.11 | $ 12.11 | $ 12.11 | $ 12.11 | $ 12.11 | $ 11.17 | $ 10.23 |
| Illustrative Hypothetical Holdco Stock Price | $162.95 | $162.95 | $162.95 | $162.95 | $162.95 | $150.30 | $137.70 |
| **Implied Broadcom Future Consideration** | | | | | | | |
| Non-electors | $ 62.92 | $ 62.20 | $ 61.43 | $ 60.11 | $ 54.50 | $ 54.50 | — |
| Unit-electors | — | $ 69.49 | $ 69.49 | $ 69.49 | $ 69.49 | $ 64.09 | $ 58.72 |

| | 2016 Non-GAAP EPS Multiple of 13.5x / $1,100mm of Synergies % of Broadcom Shares Electing Restricted Exchangeable Units | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0% | 8% | 15% | 25% | 50% | 75% | 100% |
| Estimated Pro Forma 2016E Non-GAAP EPS | $ 12.87 | $ 12.87 | $ 12.87 | $ 12.87 | $ 12.87 | $ 11.82 | $ 10.81 |
| Illustrative Hypothetical Holdco Share Price | $173.18 | $173.18 | $173.18 | $173.18 | $173.18 | $159.15 | $145.50 |
| **Implied Broadcom Future Consideration** | | | | | | | |
| Non-electors | $ 65.16 | $ 64.25 | $ 63.28 | $ 61.61 | $ 54.50 | $ 54.50 | — |
| Unit-electors | — | $ 73.85 | $ 73.85 | $ 73.85 | $ 73.85 | $ 67.87 | $ 62.05 |

| | 2016 Non-GAAP EPS Multiple of 16.0x / $1,100mm of Synergies % of Broadcom Shares Electing Restricted Exchangeable Units | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0% | 8% | 15% | 25% | 50% | 75% | 100% |
| Estimated Pro Forma 2016E Non-GAAP EPS | $ 12.87 | $ 12.87 | $ 12.87 | $ 12.87 | $ 12.87 | $ 11.82 | $ 10.81 |
| Illustrative Hypothetical Holdco Share Price | $205.84 | $205.84 | $205.84 | $205.84 | $ 205.84 | $189.17 | $172.95 |
| **Implied Broadcom Future Consideration** | | | | | | | |
| Non-electors | $ 72.31 | $ 70.79 | $ 69.17 | $ 66.37 | $ 54.50 | $ 54.50 | — |
| Unit-electors | — | $ 87.78 | $ 87.78 | $ 87.78 | $ 87.78 | $ 80.67 | $ 73.75 |

99.    In addition to securing the substantial tax benefits and financial value that would be unlocked upon converting his Broadcom holdings to Restricted Exchangeable Units, defendant Samueli also secured another personal benefit for himself in the form of continuing employment in the newly-formed company. Under the Merger Agreement, Avago has agreed to designate Samueli and another, unnamed Broadcom director to the board of the new company.

100.   The other Broadcom directors also stand to gain significant personal benefits for their efforts in securing the deal with Avago. Indeed, as the following table shows, the Individual Defendants, along with the Company's senior

management, will receive **over a hundred million dollars** in special payments – **which are not being made to ordinary stockholders** – for their previously locked-up shares, through the immediate and full vesting of their stock options and restricted stock units, upon the close of the deal.  The accelerated vesting of these holdings would not have occurred if Broadcom had remained a standalone company.

| | Total Cash Payment With Respect to Vested Options | | Total Cash Payment With Respect to RSUs | | Total Cash Payment With Respect to Vested Options and RSUs |
| --- | --- | --- | --- | --- | --- |
| **Non-Employee Directors** | **Shares** | **Value** | **Shares** | **Value** | |
| Robert J. Finocchio, Jr. | — | — | 5,219 | $ 289,562 | $ 289,562 |
| Nancy H. Handel | 10,000 | $ 142,322 | 5,219 | $ 289,562 | $ 431,884 |
| Eddy W. Hartenstein | — | — | 5,219 | $ 289,562 | $ 289,562 |
| Maria Klawe, Ph.D. | — | — | 5,219 | $ 289,562 | $ 289,562 |
| John E. Major | 20,000 | $ 369,844 | 5,219 | $ 289,562 | $ 659,406 |
| William T. Morrow | — | — | 5,219 | $ 289,562 | $ 289,562 |
| Robert E. Switz | — | — | 5,219 | $ 289,562 | $ 289,562 |
| | | | | | |
| **Named Executive Officers (1)** | **Shares** | **Value** | **Shares** | **Value** | |
| Scott A. McGregor | 835,000 | $23,428,597 | 1,183,315 | $62,652,933 | $ 89,081,530 |
| Eric K. Brandt | — | — | 452,412 | $25,100,818 | $ 25,100,818 |
| Henry Samueli, Ph.D. | — | — | — | — | — |
| Daniel A. Marotta | — | — | 392,573 | $21,780,818 | 21,780,818 |
| Rajiv Ramaswami, Ph.D. | — | — | 392,573 | $21,780,818 | 21,780,818 |

101.   Moreover, certain members of the Board and management are set to receive more than $18 million in cash in the form of "change-of-control" payments. All told, Broadcom's directors and officers stand to gain over **$178 million** in special insider benefits for themselves, while ignoring the interests of the public shareholders in maximizing the price of the Proposed Acquisition.   Defendant McGregor, Broadcom's President, CEO and director, alone, stands to receive more than $98 million in special payments, once the transaction closes.

102.   These personal benefits secured by the members of the Board were key factors in the Individual Defendants' decision to pursue the Proposed Acquisition with Avago.   Instead of attempting to negotiate an agreement reflecting the best consideration reasonably available for the public shareholders they are duty-bound to serve, the Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Acquisition to meet their own needs and objectives.  The Board's efforts to advance its members' personal interests at the

1  expense of the Company's public shareholders has resulted in the unfair Proposed

2  Acquisition being presented to the shareholders at an untenable and inadequate price.

3  **The Proposed Acquisition Undervalues Broadcom**

4  103.  The Individual Defendants' fiduciary duties require them to maximize

5  stockholder value when entering into a change-in-control transaction such as the

6  Proposed Acquisition.  Here, however, the Individual Defendants' eagerness to enter

7  into an acquisition with the Avago Defendants due to their conflicted status has

8  resulted in a sales process that was not designed to obtain the maximum price for

9  Broadcom stockholders.  As a result, the Company's public stockholders have been,

10  and will continue to be, denied the fair process and arm's-length negotiated terms to

11  which they are entitled to in a sale of their Company.

12  104.  Under the Merger Agreement, Broadcom's stockholders are set to receive

13  the Proposed Consideration with the implied value of approximately $54.50 per share,

14  as of the date of the announcement.  Broadcom stockholders will have the ability to

15  elect to receive the Proposed Consideration as either: (i) $54.50 in cash; (ii) 0.4378

16  ordinary shares in the newly-formed Singapore holding company, Holdco;

17  (iii) Restricted Exchangeable Units, which are restricted equity securities with the

18  economic equivalent of 0.4378 ordinary shares of Holdco that will not be transferable

19  or saleable for a period of one to two years after closing; or (iv) a combination thereof.

20  The Proposed Consideration represents a meager 16% premium to the Company's

21  closing price before rumors of the Proposed Acquisition were announced.

22  105.  The Proposed Consideration substantially undervalues Broadcom by

23  failing to account for, among other things, the Company's recent financial

24  performance, robust future prospects, and the substantial synergies that will result

25  from the consummation of the Proposed Acquisition.  Indeed, in the period leading up

26  to the Proposed Acquisition, Broadcom was achieving "double-digit percentage

27  growth" in both net revenue and operating margin for its largest and most important

28  lines of business, Broadband and Connectivity.  During the Company's first quarter

- 31 -

1  2015 earnings call, defendant McGregor highlighted Broadcom's surging growth and

2  announced that the Company would continue its strong financial performance and

3  "deliver top-line growth along with operating margin leverage."

4  106.  Numerous investment analysts took note of Broadcom's exceptional

5  growth prospects and valued the Company significantly higher than the Proposed

6  Consideration of $54.50 per share.  Prior to the announcement of the Proposed

7  Acquisition, at least four analysts had set price targets as high as **$59.00-$60.00 per**

8  **share** for the Company, including the following:

9  (a)  B. Riley & Co. had a target price of $60.00.

10  (b)  Nomura had a target price of $60.00.

11  (c)  J.P. Morgan had a target price of $59.00.

12  (d)  Brean Capital LLC had a target price of $59.00.

13  107.  In setting a $60.00 price target for Broadcom, the analyst for J.P. Morgan

14  reported on May 4, 2015 that the Company was primed for sustained growth and that

15  its product and development pipeline was strong:

16  [W]e believe the company remains committed to its strategy of driving
stable growth (5-8% top-line growth, double digits bottom line growth),
17  aggressive cash   return to shareholders (>60% payout ratio) and
driving free cash flow margins in the 25-30% range. The company is
18  armed with a solid pipeline of new products (Tomahawk, StrataDNX,
RSDB WiFi connectivity, 4K UHD), share gain opportunities (Cisco),
19  new customers (Xiaomi, Ericsson), and expanding market opportunities
(IoT and automotive) that we believe are driving management's
20  confidence on profitable topline growth. Near-term, we believe a
combination of a strong pipeline, large exposure to growth segments
21  (Apple  iPhone,  Samsung  GS6,  China  PON  build-out,
datacenter/enterprise networking) and relatively small exposure to the
22  PC, wireless infrastructure, and 4G low-end smartphone market is
driving strength in Broadcom's business while other peers are seeing a
23  weaker fundamental demand profile. The company's development
pipeline is also strong – we believe the team is already deep into the
24  design phase of its next generation networking products (16nm Trident
III and Tomahawk II) and is working on building its IoT
25  platform/product portfolio that it will take to the broad markets via a
distribution strategy.

26  108.  The inadequacy of the Proposed Consideration is also evident when

27  comparing the premium offered here to that offered in similar transactions.  The

28

- 32 -

Proposed Consideration's premium is less than half the average and median premium of comparable transactions. The average premiums for transactions in the semiconductor sector over the past three years to a company's one-day, one-week, and one-month average price are 30.55%, 31.15%, and 32.83%, respectively. The median premiums for transactions are 40.96%, 39.51%, and 38.61%, respectively. Here, the Proposed Consideration represents a meager one-day, one-week, and one-month premium of 15.8%, 15.5%, and 18.2%, respectively.

109. The Proposed Consideration also fails to adequately compensate Broadcom shareholders for the significant synergies that Avago will enjoy upon the completion of the Proposed Acquisition. Avago is expected to reap cost synergies at a conservative ***annual*** rate of $750 million. However, Broadcom's management projected that even greater synergistic value would be achievable, as high as ***$1.1 billion annually***. But under the Merger Agreement, the Company's public stockholders are set to receive inadequate Proposed Consideration that does not reflect the value of the substantial post-combination synergies that will inure to Avago and its stockholders, once the deal is completed.

110. Finally, to make matters worse, the Board failed to obtain a protective collar on the stock portion of the Proposed Consideration. A collar provision in the Merger Agreement would protect Broadcom stockholders from a dwindling of the value of the deal in the event of a decline in the market price of Avago common stock. A collar would prevent this from occurring by increasing the number of shares that Broadcom stockholders would receive for their stock when Avago's share price declines.

111. Based on the foregoing, it is clear that the Proposed Consideration provided under the Merger Agreement does not reflect the true inherent value of the Company, as known only to defendants at the time of the Proposed Acquisition.

1070310_1

## THE MATERIALLY FALSE AND/OR MISLEADING
## PROXY STATEMENT

112.   In connection with the upcoming shareholder vote on the Proposed Acquisition, defendants filed and disseminated a materially false and/or misleading S-4, in contravention of §§14(a) and 20(a) of the 1934 Act, and/or defendants' duty of candor and full disclosure under state law.   The S-4, which recommends that Broadcom shareholders vote in favor of the Proposed Acquisition, misrepresents and fails to disclose material information necessary for the Company's public stockholders to make an informed decision as to whether to vote their shares in favor of the Proposed Acquisition of Broadcom by Avago.

113.   The S-4 represented to shareholders that "[t]he Restricted Exchangeable Units are designed to have distribution rights that are substantially equivalent to those of the Holdco Ordinary Shares."   The S-4 further represented that "J.P. Morgan further assumed for purposes of its opinion that a Restricted Exchangeable Unit and a Holdco Ordinary Share are all economically equivalent."   These statements are materially false and/or misleading because the Restricted Exchangeable Units and Holdco Ordinary Shares that Broadcom stockholders are set to receive under the Merger Agreement are not economically or substantially "equivalent."   As detailed herein, defendants knew that Restricted Exchangeable Units and Holdco Ordinary Shares are not equivalent based on the following:

(a)   The Restricted Exchangeable Units are subject to strict holding periods, cannot be traded on the open market and are completely illiquid, in contrast to Holdco Ordinary Shares, which are not subject to those liquidity issues;

(b)   Evercore concluded that stockholders who choose to elect to receive Restricted Exchangeable Units will receive substantially greater implied future consideration than those who choose to elect to receive other forms of consideration, including Holdco Ordinary Shares or cash;

1070310_1

1    (c)    The Restricted Exchangeable Units are not taxable, while there is

2    uncertainty as to the taxability of Holdco Ordinary Shares.

3    114.   The S-4 also informed shareholders that "[t]he Broadcom board of

4    directors and the Special Committee have determined that the Merger Agreement, the

5    California Merger Agreements, the Broadcom Merger and the other transactions

6    contemplated by the Merger Agreement are advisable and in the best interests of

7    Broadcom and its shareholders." This statement is materially false and/or misleading

8    because the Board and Special Committee specifically negotiated and entered into the

9    Merger Agreement to secure merger consideration that would be tax-advantaged to

10   defendants Samueli and Nicholas, rather than to secure the maximum price for

11   Broadcom's public shareholders.

12   115.   The S-4 also represented that "the Broadcom Merger consideration to be

13   received by the holders of Broadcom Common Shares (other than any such holders

14   which are affiliates of Broadcom) who may choose not to elect to receive Restricted

15   Exchangeable Units is fair, from a financial point of view, to such holders of

16   Broadcom Common Shares." This statement is materially false and/or misleading

17   because the Restricted Exchangeable Units that defendants secured for the benefit for

18   Samueli and Nicholas were more valuable than the other forms of merger

19   consideration, based on the following:

20   (a)    Evercore concluded that stockholders who choose to elect to

21   receive Restricted Exchangeable Units will receive substantially greater implied future

22   consideration than those who choose to elect to receive other forms of consideration,

23   including Holdco Ordinary Shares; and

24   (b)    The Restricted Exchangeable Units are not taxable, while there is

25   uncertainty as to the taxability of Holdco Ordinary Shares.

26   116.   The S-4 also omitted and/or misrepresented material information about

27   the flawed sales process and the conflicts of interests that burdened the process,

28   including the following:

- 35 -

1070310_1

1          (a)     the basis for the Board's selection of, and the process by which the

2   Board identified and selected parties who might have been interested in pursuing a

3   strategic transaction with the Company;

4          (b)     the details concerning the Board's consideration of other potential

5   strategic alternatives, including continuing as a stand-alone, independent company;

6          (c)     the basis for the Board's decision not to continue discussions with

7   Company A;

8          (d)     the basis for the Board's decision not to continue discussions with

9   Company D;

10          (e)     whether interested parties were required to execute confidentiality

11   and/or standstill agreements that prevented them from submitting unsolicited offers

12   for the Company, and the terms of such agreements;

13          (f)     the reason(s) why the Board directed management in April 2015 to

14   engage with Avago only if Avago increased its price to above the mid-$50s, and why

15   the Board reversed course on this decision;

16          (g)     whether the Board considered including a protective collar as part

17   of the consideration in the Merger Agreement in order to protect Broadcom

18   stockholders from declines in Avago's stock price;

19          (h)     the reasons why the Board agreed to the Proposed Consideration in

20   the form of cash, Holdco Ordinary Shares, Restricted Exchangeable Units, and

21   combination thereof;

22          (i)     the basis for the Board's selection of, and the process by which the

23   Board selected and retained J.P. Morgan as its financial advisor on the Proposed

24   Acquisition;

25          (j)     the details surrounding J.P. Morgan's past and/or present

26   engagements by Broadcom and any of its affiliates, and any fees paid to J.P. Morgan

27   pursuant to all such engagements;

28

1070310_1

(k)   the details surrounding J.P. Morgan's past and/or present engagements by Avago, and any fees paid to J.P. Morgan pursuant to all such engagements;

(l)   the basis for the Board's selection of, and the process by which the Board selected and retained Evercore as advisor to the Special Committee;

(m)   the details surrounding Evercore's past and/or present engagements by Broadcom and any of its affiliates, and any fees paid to Evercore pursuant to all such engagements; and

(n)   the details surrounding Evercore's past and/or present engagements by Avago, and any fees paid to Avago pursuant to all such engagements;

117.   The failure to disclose the foregoing information renders the S-4 false and materially misleading in that it gives Broadcom stockholders an incomplete and distorted picture of the sales process and leaves the stockholders unable to determine whether the Board took all steps necessary to maximize shareholder value.

118.   In order for the public stockholders to make an informed decision about whether to vote for the Proposed Acquisition, defendants were required to disclose even potential conflicts of interest.  The stockholders are therefore entitled to know if their fiduciaries have interests in the transaction that are even potentially in conflict with the stockholders' interest in maximized value.  Defendants here failed to disclose material information concerning actual and potential conflicts that burdened the sales process.

119.   The S-4 also omitted and/or misrepresented material information about the intrinsic value of the Company, which makes it more likely that Broadcom's public stockholders will be coerced and misled into voting in favor of the Proposed Acquisition without that material information regarding the critical decision they face.

120.   Specifically, defendants made material misleading statements or otherwise failed to disclose material information in the S-4 concerning J.P. Morgan's financial analyses and fairness opinion, including the following:

1070310_1

(a) with respect to J.P. Morgan's *Public Multiples Analysis* relating to Broadcom, the S-4 failed to disclose whether J.P. Morgan performed any benchmarking analysis for Broadcom in connection with the selected companies in the analysis;

(b) with respect to J.P. Morgan's *Discounted Cash Flow Analysis* relating to Broadcom, the S-4 failed to disclose: (i) the implied terminal EBITDA multiples utilized by J.P. Morgan in the analysis; (ii) the individual inputs and assumptions used by J.P. Morgan to derive the discount rates of 9.0%-11.0%; and (iii) whether J.P. Morgan considered the value of Broadcom's net operating loss carryforwards in its analysis, and if so, the present value of any net operating losses;

(c) with respect to J.P. Morgan's *Public Trading Multiples Analysis* relating to Avago, the S-4 failed to disclose: (i) whether J.P. Morgan performed any type of benchmarking analysis for Avago in connection with the selected companies in the analysis; and (ii) whether J.P. Morgan considered the valuation implication of receiving Restricted Exchangeable Units, as opposed to Holdco Ordinary Shares;

(d) with respect to J.P. Morgan's *Discounted Cash Flow Analysis* relating to Avago, the S-4 failed to disclose: (i) the implied terminal EBITDA multiples utilized by J.P. Morgan in its analysis; (ii) the individual inputs and assumptions used by J.P. Morgan to derive the discount rates of 8.5%-10.5%; (iii) whether J.P. Morgan considered the value of Avago's net operating loss carryforwards in its analysis, and if so, the present value of any net operating losses; and (iv) whether J.P. Morgan considered valuation implication of receiving Restricted Exchangeable Units, as opposed to Holdco Ordinary Shares;

(e) with respect to J.P. Morgan's *Intrinsic Value of Broadcom Merger Consideration – DCF Based Analysis*, the S-4 failed to disclose: (i) the estimated amounts of transaction-related expenses utilized by J.P. Morgan in its analysis; (ii) the implied terminal EBITDA multiples utilized in the analysis; (iii) the individual inputs and assumptions used by J.P. Morgan to derive the discount rates of 8.5%-10.5%;

1   (iv) the amount of pro forma net debt of the new company; (v) whether J.P. Morgan

2   considered the value of the new company's net operating loss carryforwards in its

3   analysis, and if so, the present value of any net operating losses; and (vi) whether J.P.

4   Morgan considered the valuation implication of receiving Restricted Exchangeable

5   Units, as opposed to Holdco Ordinary Shares

6       121.   Without disclosure of the foregoing material information, Broadcom

7   shareholders are unable to assess whether J.P. Morgan's financial analyses, which

8   supported its fairness opinion, sufficiently valued the Company's intrinsic value.

9       122.   Defendants also made material misleading statements or otherwise failed

10  to disclose material information in the S-4 concerning Evercore's financial analyses

11  and its opinion to the Special Committee, including the following:

12          (a)    with respect to Evercore's *Present Value of Future Share Price*

13  *Analysis* for Broadcom, the S-4 failed to disclose the individual inputs and

14  assumptions utilized by Evercore to derive the discount rate range of 9.0%-11.0%; and

15          (b)    with respect to Evercore's *Discounted Cash Flow Analysis* for

16  Broadcom, the S-4 failed to disclose: (i) the individual inputs and assumptions used by

17  Evercore to derive the  discount rate range of 9.0%-11.0%; (ii) whether Evercore

18  considered the value of Broadcom's net operating loss carryforwards in its analysis,

19  and if so, the present value of any net operating losses.

20          (c)    with respect to Evercore's *Precedent Transactions Analysis* for

21  Broadcom, the S-4 failed to disclose the individual TEV/NTM multiples for each of

22  the target companies used by Evercore in its analysis;

23          (d)    with respect to Evercore's *Present Value of Future Share Price*

24  *Analysis* for Avago, the S-4 failed to disclose: (i) the individual inputs and

25  assumptions utilized by Evercore to derive the discount rate range of 8.5%-10.5%;

26  (ii) whether Evercore considered the valuation implication of receiving Restricted

27  Exchangeable Units, as opposed to Holdco Ordinary Shares; and

28

- 39 -

(e)      with respect to Evercore's *Discounted Cash Flow Analysis* for Avago, the S-4 failed to disclose: (i) the individual inputs and assumptions used by Evercore to derive the discount rate range of 8.5%-10.5%; (ii) whether Evercore considered the value of Avago's net operating loss carryforwards in its analysis, and if so, the present value of any net operating losses; (iii) whether Evercore considered the valuation implication of receiving Restricted Exchangeable Units, as opposed to Holdco Ordinary Shares;

123.   Without disclosure of the foregoing material information, Broadcom shareholders are unable to assess whether Evercore's financial analyses sufficiently valued the Company's intrinsic value, and whether its opinion concerning the fairness of the various forms of Merger Consideration (*i.e.*, cash consideration, Holdco Ordinary Shares and Restricted Exchangeable Shares) are reasonable and accurate.

124.   Defendants also made material misleading statements or otherwise failed to disclose material information concerning the financial projections for Broadcom for years 2015 through 2017, which were prepared by Broadcom management and relied upon by J.P. Morgan and Evercore for purposes of their respective financial analyses. In particular, the S-4 omits the following line items relating to those financial projections: (a) EBITDA; (b) taxes (or tax rate); (c) capital expenditures; (d) changes in net working capital; (e) stock-based compensation expense; (f) any other adjustments to unlevered free cash flow; (g) unlevered free cash flow.  Without this material financial information, shareholders cannot conduct their own accurate assessment of Broadcom's value based on the financial projections provided by the Company's management.  These omissions render the information concerning the financial projections set forth on pages 130-31 and 134-35 of the S-4 materially misleading.

125.   There is no more material information to shareholders in a corporate acquisition than the information underlying or supporting the purported "fair value" of their shares.  Shareholders are entitled to the information necessary to inform a

- 40 -

decision as to the adequacy of the merger consideration, which includes the underlying data (including management's projections) the financial advisors relied upon, the key assumptions that the financial advisors used in performing valuation analyses, and the range of values that resulted from those analyses.  Here the analyses of Broadcom's financial advisors incorporated certain critical assumptions that significantly affect the output (valuation) of the analyses.  Without this material information, shareholders have no basis on which to judge the adequacy of the Proposed Acquisition.

126.   Without full and fair disclosure of the material information set forth above, Broadcom's shareholders should not be asked to vote to approve the Proposed Acquisition.  Plaintiffs therefore seek to enjoin the Proposed Acquisition.

## CLASS ACTION ALLEGATIONS

127.   Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all holders of Broadcom common stock that have been or will be harmed by the conduct described herein (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the defendants.

128.   This action is properly maintainable as a class action.

129.   The Class is so numerous that joinder of all members is impracticable.  According to the S-4, as of July 29, 2015, there were more than 558.7 million shares of Broadcom Class A common stock outstanding and more than 48 million shares of Broadcom Class B common stock outstanding.

130.   There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include, but are not limited to, the following:

(a)      Whether the Individual Defendants, other than defendant Nicholas, have breached their fiduciary duties of loyalty, good faith, and/or due care with

1070310_1

respect to plaintiffs and the other members of the Class in connection with the Proposed Acquisition;

(b)     Whether the Individual Defendants, other than defendant Nicholas, breached their fiduciary duty to secure and obtain the best price reasonably available under the circumstances for the benefit of plaintiffs and the other members of the Class in connection with the Proposed Acquisition;

(c)     Whether the Proposed Acquisition is entirely fair to the Class;

(d)     Whether defendants, in bad faith and for improper motives, impeded or erected barriers designed to discourage other potentially interested parties from making an offer to acquire the Company or its assets;

(e)     Whether defendant Nicholas and the Avago Defendants aided and abetted any of the other defendants' breaches of fiduciary duties owed to plaintiffs and the other members of the Class in connection with the Proposed Acquisition; and

(f)     Whether plaintiffs and the other members of the Class would suffer irreparable injury were the Proposed Acquisition consummated.

131.   Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs do not have any interests adverse to the Class.

132.   Plaintiffs have retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

133.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

134.   Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

1070310_1

135.   Defendants have acted, or failed to act, on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**COUNT I**

**Against All Defendants**
**for Violations of §14(a) of the 1934 Act and**
**SEC Rule 14a-9 Promulgated Thereunder**

136.   Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

137.   SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the 1934 Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

138.   Defendants prepared, reviewed and/or disseminated the false and misleading S-4 which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  As stated herein, the S-4 misrepresented and/or omitted material facts, including material information about the unfair consideration offered in the Proposed Acquisition, the actual intrinsic value of the Company, the flawed and unfair sales process orchestrated by defendants, and the conflicts of interest that burdened the process.

139.   The omissions and false and misleading statements made by defendants in the S-4 constitute violations of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, because such statements are materially false and/or misleading and were provided in at least a negligent manner.  By virtue of their

- 43 -

positions within the Company and/or roles in the process and in the preparation of the S-4, defendants were aware of this information and of their duty to disclose this information in the S-4.

140.    The omissions and false and misleading statements in the S-4 are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the S-4 and in other information reasonably available to shareholders.

141.   By reason of the misconduct detailed herein, defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

**Against the Individual Defendants (Except Defendant Nicholas)
and the Avago Defendants
for Violation of §20(a) of the 1934 Act**

142.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

143.    The Individual Defendants (other than defendant Nicholas) acted as controlling persons of Broadcom within the meaning of §20(a) of the 1934 Act.

(a)    By virtue of their positions as officers and/or directors and/or controlling shareholders of Broadcom, and/or their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the S-4 filed with the SEC, the Individual Defendants (other than defendant Nicholas) had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

- 44 -

(b)     Each of the Individual Defendants (other than defendant Nicholas) were provided with or had unlimited access to copies of the S-4 and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

(c)     The S-4 details the Individual Defendants' (other than defendant Nicholas) involvement in negotiating, reviewing and approving the Proposed Acquisition  and preparation of the S-4.

(d)     The S-4 contains the recommendation or authorization of each of the Individual Defendants (other than defendant Nicholas) to approve the Proposed Acquisition.  They were thus directly involved in the making of this document.

(e)     By reason of such conduct, the Individual Defendants (other than defendant Nicholas) are liable pursuant to §20(a) of the 1934 Act.

144.   The Avago Defendants are controlling persons of Broadcom and the Individual Defendants within the meaning of §20(a) of the 1934 Act.  By reason of its contractual obligations with Broadcom and the Individual Defendants, the Avago Defendants possessed control over Broadcom and the Individual Defendants.

(a)     Broadcom and the Individual Defendants were required by §6.1 of the Merger Agreement to refrain from changing the operation of the Company's business or engaging in a variety of business activities without the express written consent of the Avago Defendants.

(b)     Pursuant to §6.8 of the Merger Agreement, Broadcom and the Avago Defendants were jointly responsible for the preparation of the S-4, and the Avago Defendants were required to file the S-4 with the SEC.

(c)     By reason of such conduct, the Avago Defendants are liable pursuant to §20(a) of the 1934 Act.

- 45 -

# COUNT III

**Claim for Breach of Fiduciary Duty
Pursuant to California Corporations Code §1312(b)
Against the Individual Defendants (Except Defendant Nicholas)**

145.    Plaintiffs repeat and reallege all previous allegations as if set forth fully herein.

146.    As alleged herein, the Individual Defendants (other than defendant Nicholas), as directors and/or officers of the Company, have breached their fiduciary duties to the Company's stockholders by failing to engage in an honest and fair sales process.  The Individual Defendants (other than defendant Nicholas) have violated their fiduciary duties by entering into the Proposed Acquisition without regard to the fairness of the transaction to Broadcom's public shareholders.  In agreeing to the Proposed Acquisition, these Individual Defendants have also initiated a process to sell Broadcom that imposes heightened fiduciary responsibilities on them and requires enhanced scrutiny by the Court.  The Individual Defendants (other than defendant Nicholas) owe fundamental fiduciary obligations to the Company's shareholders to take all necessary and appropriate steps to maximize the value of their shares in implementing such a transaction, including the responsibility to conduct fair and active bidding procedures and to negotiate to obtain the best possible price for the Company's public shareholders.  For the reasons set forth above, the Individual Defendants (other than defendant Nicholas) failed to maximize shareholder value.

147.    The Individual Defendants (other than defendant Nicholas) each have a fiduciary obligation to disclose all material information to plaintiffs and the Class concerning the Proposed Acquisition.  The Individual Defendants (other than defendant Nicholas) failed to adequately discharge their responsibility.

148.    As a result of these Individual Defendants' breaches, plaintiffs and the Class have been and will be harmed in that they will not receive fair and adequate consideration for their Broadcom stock.

1070310_1

149.   Unless the Proposed Acquisition is enjoined by the Court, the Individual Defendants, other than defendant Nicholas, will continue to breach their fiduciary duties owed to plaintiffs and the members of the Class, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

**COUNT IV**

**Claim for Aiding and Abetting Breaches of Fiduciary Duty
Pursuant to California Corporations Code §1312(b)
Against Defendants Nicholas and the Avago Defendants**

150.   Plaintiffs repeat and reallege all previous allegations as if set forth fully herein.

151.   As alleged herein, defendant Nicholas and the Avago Defendants were well aware that the Individual Defendants were breaching their fiduciary duties to the Company's public shareholders and substantially assisted the Individual Defendants.

152.   As a result, plaintiffs and Class members have been and will be harmed in that they will not receive fair and adequate consideration for their Broadcom stock.

**COUNT V**

**Claim for Breach of Fiduciary Duties Against the
Individual Defendants (Except Defendant Nicholas)**

153.   Plaintiffs repeat and reallege all previous allegations as if set forth fully herein.

154.   The Individual Defendants, other than defendant Nicholas, have violated the fiduciary duties of care, loyalty and good faith owed to the public stockholders of Broadcom and have acted to put their personal interests ahead of the interests of Broadcom stockholders.

155.   By the acts, transactions, and course of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiffs and the other members of the Class of the true value of Broadcom.

- 47 -

1070310_1

156.   The Individual Defendants, other than defendant Nicholas, have violated their fiduciary duties by entering Broadcom into the Proposed Acquisition without regard to the effect of the Proposed Acquisition on Broadcom's stockholders.

157.   As demonstrated by the allegations above, the Individual Defendants, other than defendant Nicholas, failed to exercise the care required and breached their duty of loyalty owed to the stockholders of Broadcom because, among other reasons:

(a)     They failed to take steps to maximize the value of Broadcom to its public stockholders;

(b)     They failed to properly value Broadcom and its various assets and operations; and

(c)     They ignored or did not protect against the numerous conflicts of interests resulting from the Individual Defendants' own financial stakes in the Proposed Acquisition.

158.   Because the Individual Defendants dominate and control the business and corporate affairs of Broadcom, and have access to private corporate information concerning Broadcom's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Broadcom that makes it inherently unfair for them to pursue and recommend the Proposed Acquisition wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

159.   By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants, other than defendant Nicholas, have failed to exercise ordinary care and diligence in the exercise of their fiduciary duties toward plaintiffs and the other members of the Class.

160.   The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiffs and the other members of the Class, and have breached and are breaching their fiduciary duties owed to the Class.

1070310_1

161.   As a result of the Individual Defendants' unlawful actions, plaintiffs and the other members of the Class will be irreparably harmed in that they will not receive fair or adequate consideration for the value of Broadcom's assets and operations. Unless the Proposed Acquisition is enjoined by the Court, the Individual Defendants, other than defendant Nicholas, will continue to breach their fiduciary duties owed to plaintiffs and the members of the Class, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

162.   Plaintiffs and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiffs and the members of the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

**COUNT VI**

**Claim for Aiding and Abetting Breaches of Fiduciary Duties
Against Defendant Nicholas and the Avago Defendants**

163.   Plaintiffs repeat and reallege all previous allegations as if set forth fully herein.

164.   Defendant Nicholas and the Avago Defendants knowingly assisted the Individual Defendants' breaches of fiduciary duties in connection with the Proposed Acquisition, which, without such aid, would not have occurred.  In connection with discussions regarding the Proposed Acquisition, Nicholas and the Avago Defendants obtained, sensitive, non-public information concerning Broadcom and thus had unfair advantages that are enabling the Avago Defendants to acquire the Company at an unfair and inadequate price.

165.   As a result of this conduct, plaintiffs and the other members of the Class have been and will be harmed in that they have been and will be prevented from obtaining a fair price for their Broadcom shares.

166.   As a result, plaintiffs and the Class members are being irreparably harmed.

- 49 -

167. Plaintiffs and the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand injunctive relief, in plaintiffs' favor and in favor of the Class and against defendants as follows:

A. Declaring that this action is properly maintainable as a class action;

B. Rescinding, to the extent already implemented, the Merger Agreement;

C. Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process reasonably designed to enter into a merger agreement providing the best possible value for stockholders;

D. Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

E. Granting such other and further equitable relief as this Court may deem just and proper.

DATED: September 2, 2015

ROBBINS GELLER RUDMAN
 & DOWD LLP
DAVID T. WISSBROECKER
EDWARD M. GERGOSIAN
PHONG L. TRAN


                    s/ David T. Wissbroecker
              DAVID T. WISSBROECKER

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

1070310_1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
EDWARD B. GERARD
JUSTIN D. RIEGER
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: 619/525-3990
619/525-3991 (fax)

ANDREWS & SPRINGER LLC
PETER B. ANDREWS
CRAIG J. SPRINGER
3801 Kennett Pike Building C, Suite 305
Wilmington, DE 19807
Telephone: 302/504-4957
302/397-2681 (fax)

DUNNAM DUNNAM HARMON WEST
   LINDLEY & RYAN LLP
HAMILTON P. LINDLEY
4125 W. Waco Drive
Waco, TX 76710
Telephone: 254/753-6437
254/753-7434 (fax)

Attorneys for Plaintiffs

- 51 -

1

<u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on September 2, 2015, I authorized the electronic filing of

3 the foregoing with the Clerk of the Court using the CM/ECF system which will send

4 notification of such filing to the e-mail addresses denoted on the attached Electronic

5 Mail Notice List, and I hereby certify that I caused to be mailed the foregoing

6 document or paper via the United States Postal Service to the non-CM/ECF

7 participants indicated on the attached Manual Notice List.

8      I certify under penalty of perjury under the laws of the United States of America

9 that the foregoing is true and correct.  Executed on September 2, 2015.

10                                          s/ David T. Wissbroecker
                                          DAVID T. WISSBROECKER

11
                                          ROBBINS GELLER RUDMAN
12                                           & DOWD LLP
                                          655 West Broadway, Suite 1900
13                                          San Diego, CA  92101-8498
                                          Telephone:  619/231-1058
14                                          619/231-7423 (fax)

15                                          E-mail:   dwissbroecker @rgrdlaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

1070310_1

# Mailing Information for a Case 8:15-cv-00979-JVS-PJW Robert Wytas et al v. Scott A McGregor et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Sarah E Diamond**
  sarah.diamond@lw.com,karen.patterson@lw.com,#ocecf@lw.com,nathan.saper@lw.com,Faraz.Mohammadi@lw.com

- **Boris Feldman**
  boris.feldman@wsgr.com

- **Edward Burns Gerard**
  egerard@robbinsarroyo.com

- **Edward Michael Gergosian**
  egergosian@rgrdlaw.com

- **Patrick E Gibbs**
  patrick.gibbs@lw.com,Zoila.Aurora@LW.com,#SVLitigationServices@lw.com

- **Brian T Glennon**
  brian.glennon@lw.com

- **Catherine E Moreno**
  cmoreno@wsgr.com,pmarquez@wsgr.com

- **Stephen J Oddo**
  soddo@robbinsarroyo.com,notice@robbinsarroyo.com

- **Brian J Robbins**
  brobbins@robbinsarroyo.com,notice@robbinsarroyo.com

- **Ignacio E Salceda**
  isalceda@wsgr.com

- **David T Wissbroecker**
  dwissbroecker@rgrdlaw.com,e_file_sd@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Justin        D Rieger
Robbins Arroyo LLP
600 B Street Suite 1900
San Diego, CA 92101
```